# In the United States Court of Federal Claims

No. 04-1743T

Filed: September 30, 2008

**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
|  | \* |  |
| WILLIAM H. SCHELL AND | \* |  |
| RUBY G. SCHELL, | \* | Jurisdiction; |
|  | \* | Standing; |
| Plaintiffs, | \* | Substantial Variance Doctrine; |
|  | \* | Tax Equity and Fiscal Responsibility Act of |
|  | \* |     1982, 26 U.S.C. §§ 6221–33; |
| v. | \* | Tucker Act, 28 U.S.C. § 1491; |
|  | \* | 26 U.S.C. §§ 7422(a), (h); |
| THE UNITED STATES, | \* | RCFC 12(b)(1). |
|  | \* |  |
| Defendant. | \* |  |
|  | \* |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Teresa J. Womack,** Redding & Associates, P.C., Houston, Texas, Counsel for Plaintiffs.

**Karen E. Servidea**, United States Department of Justice, Tax Division, Washington D.C., Counsel for Defendant.

### MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge.*

**I.    FACTUAL BACKGROUND.**[1]

In the mid-1980s, William H. Schell invested in two limited partnerships offered by American Agri-Corp ("AMCOR")[2]. William H. Schell held a limited partnership interest in Canyon Desert Vineyards ("CDV") during the tax years 1985–93 and in Vista Ag-Realty ("VAR") during the tax years 1986–95. *See* Compl. ¶¶ 6, 13. For fiscal year 1985, CDV reported losses on farming expenses of approximately $7.4 million and $196,000 in miscellaneous expenses. *See* Gov't Ex. 1, App. B at B-5. William H. Schell and his wife, Ruby G. Schell[3] ("Plaintiffs"), reported these losses on their joint 1985 federal tax return and claimed a deduction of $73,811, their share of this partnership loss. *See* Gov't Ex. 2, App. B at B-24; *see also* Gov't Ex. 3, App. B at B-38 (Pls. 1985 Schedule K-1 for CDV). In addition, CDV reported approximately $6.4 million of partnership liabilities in 1985, of which $62,525 was attributed to and reported by Plaintiffs as a loss. *See* Gov't Ex. 1, App. B at B-6; Gov't Ex. 3, App. B at B-38; Gov't Ex. 4, App. B at B-41.

In fiscal year 1986, VAR also reported substantial losses. *See* Gov't Ex. 9, App. B at B-82 (VAR federal income tax partnership return for fiscal year 1986). VAR reported a net loss of approximately $11.1 million on farming expenses and approximately $291,000 of miscellaneous expense deductions. *See* Gov't Br. at 8; Gov't Ex. 9, App. B at B-82. Plaintiffs' share of the VAR partnership loss totaled $69,840. *See* Gov't Br. at 9; Gov't Ex. 11, App. B at B-115. Like CDV, VAR also reported approximately $10.9 million of partnership liabilities for 1986, of which $35,000 was

---

[1] The facts recited herein were derived from: the December 6, 2004 Complaint ("Compl."); Plaintiffs' Exhibits In Support Of The Complaint ("Pls. Ex."); the Government's December 20, 2007 Motion To Dismiss The Complaint And Brief In Support ("Gov't Br."); the Government's December 20, 2007 Exhibits In Support ("Gov't Ex."); Plaintiffs' April 2, 2008 Response ("Pls. Resp."); and the Government's May 12, 2008 Reply ("Gov't Reply").

[2] In *Prati* v. *United States*, 81 Fed. Cl. 422 (2008), the United States Court of Federal Claims, described the nature of AMCOR partnerships, as follows:

> In the early 1980s, AMCOR organized a number of limited partnerships for which it acted as the corporate general partner. The AMCOR Partnerships were agricultural investment entities geared towards high income professionals, and AMCOR solicited investments from such individuals across the country. AMCOR's stated goal was to develop farmland, grow fruit crops such as dates, and other crops such as wheat, corn and alfalfa. By 1987, the AMCOR Partnerships had become the subject of an IRS audit and investigation. The IRS alleged that the AMCOR Partnerships . . . were actually illegal tax shelters.

*Id.* at 425-26 (internal citation omitted).

[3] Ruby G. Schell is a party, because she and her husband filed joint federal income tax returns. *See* Compl. ¶ 5.

2

Plaintiffs' share. *See* Gov't Ex. 9, App. B at B-83; Gov't Ex. 11, App. B at B-115. Plaintiffs reported on their 1986 federal tax returns that CDV and VAR had losses. *See* Gov't Ex. 10, App. B at B-92, 99, 112 (Pls. 1986 Federal Tax Return); *see also* Gov't Ex. 11, App. B at B-115 (Pls. 1986 Schedule K-1 for VAR).

On March 14, 1990 and April 10, 1991, the Internal Revenue Service ("IRS") sent CDV and VAR a Final Partnership Administrative Adjustments ("FPAA"),[4] disallowing all claimed deductions. *See* Gov't Ex. 5, App. B at B-57-62. Both CDV and VAR contested these IRS rulings in the United States Tax Court. *See* Gov't Ex. 5, App. B at B-44 (CDV's Petition For Readjustment); *see also* Gov't Ex. 13, App. B at B-122 (VAR's Petition For Readjustment). Sometime in 1993, CDV was dissolved. *See* Compl. ¶ 7. In 1995, VAR was dissolved. *See* Compl. ¶ 14.

On April 28, 1997, while CDV's and VAR's Petitions For Readjustment were pending before the United States Tax Court, Plaintiffs entered into two Settlement Agreements with the IRS that disallowed approximately half of the partnership deductions reported.[5] *See* Gov't Ex. 6, App. B at B-66 (Settlement Agreement with CDV); Gov't Ex. 14, App. B at B-136 (Settlement Agreement with VAR).

On March 29, 1999, Plaintiffs filed a claim for a refund of $6,797, representing their proportionate share of interest in the dissolved VAR. *See* Pls. Ex. 2. On April 23, 1999, Plaintiffs also filed a claim with the IRS for a tax refund of $12,862, representing their interest in the now dissolved CDV. *See* Pls. Ex. 1. Plaintiffs claimed the termination of the two partnerships entitled them to deduct the losses against Schell's partnership interests. *See* Compl. ¶¶ 9(D), 17(D) ("As a direct consequence of the settlement and the corrections of the erroneous reporting of a termination distribution, there was a substantial basis in the partnership interest and a resulting loss upon the dissolution and termination

---

[4] Section 6223(a) of the Internal Revenue Code ("I.R.C.") provides that:

(a) [the] Secretary [of the Treasury Department ("the Secretary")] must give partners notice of beginning and completion of administrative proceedings. The Secretary shall mail to each partner whose name and address is furnished to the Secretary notice of--
(1) the beginning of an administrative proceeding at the partnership level with respect to a partnership item, and
(2) the *final partnership administrative adjustment* resulting from any such proceeding.

26 U.S.C. § 6223(a) (emphasis added).

[5] The April 28, 1997 Settlement Agreements disallowed "approximately $3.4 million, or approximately 45%, of the farming and miscellaneous deductions [that] CDV originally reported" and "approximately $5.6 million, or approximately 50%, of the farming and miscellaneous deductions [that] VAR originally reported." Gov't Br. at 7, 10; *see also* Gov't Ex. 6, App. B at B-66.

3

of the partnership, which loss is the basis of this claim for refund."). In calculating the amount of their tax refund claims, Plaintiffs asserted that the Settlement Agreements increased the basis of Schell's partnership interest by the amount of disallowed loss, and Plaintiffs offset this amount by any income or distribution received. *Id*. at 12-13.

On December 6, 2002, the IRS rejected Plaintiffs' March 29, 1999 VAR tax refund claim, but informed Plaintiffs that the "AMCOR claims" would be treated as capital losses and included instructions for claiming those losses. *See* Pls. Ex. 3. To date, the IRS has taken no action on Plaintiffs' April 23, 1999 CDV refund claim. *See* Compl. ¶¶ 9, 10.[6]

## II. PROCEDURAL HISTORY.

On December 6, 2004, a Complaint was filed in the United States Court of Federal Claims alleging that the IRS unlawfully denied Plaintiffs' claims for a tax refund for the 1993 and 1995 tax years. *See* Compl. The case was assigned to the undersigned judge. On February 4, 2005, the parties filed a Joint Motion To Stay pending the final resolution of: *Isler* v. *United States*, Fed. Cl. No. 01-344T; *Scuteri* v. *United States*, Fed. Cl. No. 01-358T; and *Prati* v. *United States*, Fed. Cl. No. 02-060T.

On April 19, 2006, Chief Judge Edward J. Damich caused this case and other AMCOR tax refund cases to be transferred to the Honorable Lawrence J. Block for "administrative convenience." Apparently, Chief Judge Damich was under the misimpression that the legal issues presented in this case were the same as *Prati*, the lead case before Judge Block. On May 9, 2006, Judge Block reassigned this case back to the undersigned judge, since the legal issues to be adjudicated in *Prati* were: 1) whether IRS's assessment complied with the statute of limitations (*see Prati*, 81 Fed. Cl. at 429-37); 2) whether the United States Court of Federal Claims had jurisdiction to adjudicate Plaintiffs' claim for interest assessed under 26 U.S.C. § 6621(c) (*id*. at 437-39); and 3) whether the IRS abused its discretion in refusing to abate the penalty assessed against Plaintiffs. *Id*. at 439-40. None of these legal issues were presented in this case.

On January 4, 2007, the parties requested that the court continue to stay this case, because of the consideration of the United States Supreme Court in another pending federal tax case. Based on that representation, the court granted the stay on January 5, 2007. On May 21, 2007, the United States Supreme Court issued an opinion in *Hinck* v. *United States*, 127 S. Ct. 2011 (2007), holding that the United States Tax Court is the exclusive forum for judicial review of a failure to abate interest. On September 5, 2007, the court convened a telephone conference to confirm that *Hinck*, in fact, was not dispositive of any claims in this case. On September 17, 2007, the court issued an Order To Lift The January 5, 2007 Stay and required the Government to file an Answer or dispositive motion by November 5, 2007.

---

[6] In 2001, however, the United States Tax Court disallowed similar deductions claimed in *Canyon Desert Vineyards* v. *Comm'r of Internal Revenue*, No. 15054-91 (T.C. July 19, 2001).

After receiving a 45-day extension of time, the Government filed a Motion To Dismiss on December 20, 2007. On March 18, 2008, the court ordered Plaintiffs to respond on or before April 1, 2008. Plaintiffs filed a Response on April 2, 2008, by leave of the court. On May 12, 2008, the Government filed a Reply.

### III. DISCUSSION.

#### A. Jurisdiction.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act. *See* 28 U.S.C. § 1491. This Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id*. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon it whenever the substantive right exists." *United States* v. *Testan*, 424 U.S. 392, 398 (1976).

Therefore, in order to pursue a substantive right within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.").

The United States Court of Appeals for the Federal Circuit has affirmed that the United States Court of Federal Claims has jurisdiction over federal tax refund claims, pursuant to 26 U.S.C. § 7422(a). Thereunder, no claim for a tax refund may be filed unless such a claim first has been filed with the IRS. *Id*. ("No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary[.]"). The burden of establishing jurisdiction falls upon the party asserting jurisdiction. *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the party seeking the court to exercise jurisdiction to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1). In addition, the tax amount in dispute must be paid before a refund suit may be initiated in the United States Court of Federal Claims. *See* 26 U.S.C. § 1346(a); *see also Flora* v. *United States*, 362 U.S. 145, 146 (1960).

**B.     Standing**.

The United States Supreme Court has stated that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Specifically, to establish standing, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

**C.     Standard For Decision On A Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *See Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter[.]"). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question, . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of evidence.").

**D.     The Tax Equity And Fiscal Responsibility Act of 1982.**

Prior to 1982, partnerships were treated as aggregate entities. *See* MICHAEL D. ROSE & JOHN C. CHOMMIE, FEDERAL INCOME TAX § 9.02 (3d ed. 1988). Federal tax returns were filed by each partner, and the IRS was required to resolve any problems with each partner separately. *Id.* To correct administrative problems inherent in this scheme, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). *See* Pub. L. 97-248 (codified in 26 U.S.C. §§ 6221–33); *see also* ROSE, *supra*, § 9.02. Under TEFRA, "partnership items" are to be determined in partnership level proceedings. *See* 26 U.S.C. § 6221; *see also* 26 U.S.C. § 6231(a)(3) (defining a "partnership item" as "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A"); 1 WILLIAM S. MCKEE ET AL., FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶

10.01 (4th ed. 2008).  Partnership level proceedings may only be initiated by a "tax matters partner."  *See* 26 U.S.C. § 6226(a);[7] *see also* 26 U.S.C. § 6231(a)(7).[8]

---

[7] Section 6226(a) of the Internal Revenue Code ("I.R.C.") provides:

Petition by tax matters partner.--Within 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for a readjustment of the partnership items for such taxable year with--
    (1) the Tax Court,
    (2) the district court of the United States for the district in which the partnership's principal place of business is located, or
    (3) the [United States] Court of Federal Claims.

26 U.S.C. § 6226(a).

[8] Section 6231(a)(7) defines a "tax matters partner" as:

(7) Tax matters partner.--The tax matters partner of any partnership is--
(A) the general partner designated as the tax matters partner as provided in regulations, or
(B) if there is no general partner who has been so designated, the general partner having the largest profits interest in the partnership at the close of the taxable year involved (or, where there is more than 1 such partner, the 1 of such partners whose name would appear first in an alphabetical listing).

If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner. The Secretary shall, within 30 days of selecting a tax matters partner under the preceding sentence, notify all partners required to receive notice under section 6223(a) of the name and address of the person selected.

26 U.S.C. § 6231(a)(7).

### E. The Government's Motion To Dismiss, Pursuant to RCFC 12(b)(1).

#### 1. The Parties' Arguments.

##### a. The Government's Argument.

A taxpayer claiming a loss deduction must demonstrate the "objective legitimacy" of the transaction in which the taxpayer invested. *See* Gov't Br. at 16 (citing *Brown* v. *United States*, 396 F.2d 459, 460-61 (Ct. Cl. 1968) (considering objective nature of underlying transaction before denying claimed loss)). Therefore, Plaintiffs' claimed losses in the CDV and VAR partnerships first require adjudication as to whether "the partnerships' managing partners acted with a profit motive and whether the partnerships' transactions were not shams." *Id*. at 18. Under TEFRA, however, the objective legitimacy of partnership transactions is a "partnership item," and "the tax treatment of any partnership item . . . shall be determined at the partnership level." *Id*. at 19-20 (citing 26 U.S.C. § 6221;[9] *see also* Treas. Reg. § 301.6231 (defining a "partnership item" to involve "legal and factual determinations that underline the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction[.]")). Since Plaintiffs are not "tax matter partners," the Government, in effect, argues they do not have standing to request adjudication of "partnership-items" in the United States Court of Federal Claims. *Id.* at 21 (citing 26 U.S.C. § 7422(h) ("No [individual taxpayer] action may be brought for refund attributable to partnership items.")); *see also Keener* v. *United States*, 76 Fed. Cl. 455, 468-470 (2007) (acknowledging that "[c]ourts directly dealing with the sham transaction doctrine have concluded that its application presents a partnership item.").

In addition, the Government argues that no "jurisdictional exception" applies. *See* Gov't Br. at 21. Section 7422(h) of the I.R.C. provides that "[n]o [individual taxpayer] action may be brought for refund attributable to partnership items," unless one of two exceptions applies. *Id*. (citing 26 U.S.C. § 7422(h)). The December 6, 2004 Complaint invokes one of these exceptions, Section 6230(c)(1)(B) of the I.R.C., that provides:

> A partner may file a claim for refund on the grounds that . . . the Secretary failed to allow a credit or to make a refund to the partner in the amount of the overpayment

---

[9] Section 6221 of the I.R.C. states:

Except as otherwise provided in this subchapter, the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) *shall be determined at the partnership level*.

26 U.S.C. § 6221 (emphasis added).

attributable to the application to the partner of a settlement, a final partnership administrative adjustment, or the decision of a court in an action brought under section 6226 or section 6228(a).

26 U.S.C. § 6230(c)(1)(B). The December 6, 2004 Complaint asserts that "the Secretary has failed to make a refund [to Plaintiffs] for the overpayment attributable to" the application of the settlement agreements that were entered for tax years 1985 and 1986. *See* Compl. ¶¶ 9(E), 17(E).

The Government explains that a court, adjudicating a partner-level suit, may only "incorporate the partnership-level determination of partnership items into the partner-level suit," and therefore "lack[s] jurisdiction to determine such items for itself." Gov't Br. at 22 (citing 26 U.S.C. § 6230(c)(4) ("For purposes of any claim or suit under this subsection, the treatment of partnership items on the partnership return, under the [S]ettlement, under the final partnership administrative adjustment, or under the decision of the court (whichever is appropriate) shall be conclusive.")); *see also* Gov't Ex. 6, 14, App. B (the April 18, 1997 Settlements provide that: "no claim for refund or credit based on any change in the treatment of partnership items may be filed or prosecuted"). Therefore, Plaintiffs may invoke the Section 6230(c)(1)(B) exception, but only after a "determination that the partnership[s'] transactions were entered into for profit and were not shams." Gov't Br. at 23. The final partnership records for the CDV and VAR partnerships, however, contain no such determination, nor does the April 18, 1997 Settlements. *Id.*

    b.  **Plaintiffs' Response.**

Plaintiffs respond that the Government misconstrues their theory of liability. *See* Pls. Resp. at 17 ("The government's representation of how the [Plaintiffs'] basis was computed is patently wrong and fails to reflect the income reported . . . in the years after 1986[.]"). Plaintiffs' 1993 and 1995 "loss deductions are not substantially the same partnership loss deduction they claimed in 1985 and 1986 . . . The 1993 and 1995 losses represent the Schells' outside basis in the investment in the partnerships as of the time the partnerships were terminated[.]" *Id.* at 13. Even beginning "with [a] zero basis at the end of 1985 and 1986, [Plaintiffs'] basis in 1993 and 1995 was as claimed on their refund claim." *Id.* at 17. In support, Plaintiffs cite two IRS communications. *Id.* at 13, 17 (citing "AMCOR CLAIM INSTRUCTIONS" and a January 6, 2000 Regional Counsel Memorandum).[10] In addition, Plaintiffs also assert that the IRS incorrectly classified those losses as capital losses, because they "did not result from sale but termination[.]" *Id.* at 14.

---

[10] "AMCOR CLAIM INSTRUCTIONS" states, in part, that: "A claim may be filed to reflect the increase in your basis due to the sale of the partnership interest." Pls. Resp. at 13. The January 6, 2000 Regional Counsel Memorandum provides that: "The individual investor's transcript of account for this taxable year should show an assessment of tax being made as a result of a computational adjustment relating to Form 870-P(AD). *Id.* at 17. The partner's basis will be increased, under the provisions of I.R.C. 705, by the amount his taxable income was increased as a result of the settlement." *Id.*

Finally, Plaintiffs contend that the April 28, 1997 Settlements were "comprehensive and conclusive" and all of the relevant items were transformed therein into "nonpartnership items." *See* Pls. Resp. at 10-11 (citing 26 U.S.C. § 6231(b)(1)(C) ("The partnership items of a partner for a partnership taxable year shall become nonpartnership items as of the date the Secretary or the Attorney General (or his delegate) enters into a settlement agreement with the partner with respect to such items[.]")). Plaintiffs argue that "if a partner settles his partnership items, subsequent determinations at the partnership level will not apply to the settling partner, and § 7422(h)'s jurisdictional bar no longer applies," thereby allowing Plaintiffs to litigate their claims before this court. *Id.* at 14.

### c.     The Government's Reply.

The Government replies that the April 10, 1991 FPAA conclusively determined that all of the partnership transactions that gave rise to the CDV and VAR losses were "shams." *See* Gov't Reply at 9–14. The April 28, 1997 Settlement Agreements did not re-visit this issue and therefore did not change the FPAA's determination. *Id.* at 12 ("The settlement agreements at issue here . . . contain no determination that CDV's or VAR's transactions were *bona fide* or entered into for profit."). Accordingly, the FPAA "sham transaction" determination cannot be re-litigated here. *Id.* at 13.

Plaintiffs could "have decided to settle the amount of partnership losses" and still contest the sham-transaction determination. *Id.* at 12-13. That did not happen. *Id.* Section 6231(b)(1)(C) converts "partnership items" into "non-partnership items," but only where those items *specifically* are settled by agreement. *Id.* at 13 (citing 26 U.S.C. § 6231(b)(1)(C) ("The partnership items of a partner for a partnership taxable year shall become nonpartnership items as of the date the Secretary or the Attorney General (or his delegate) enters into a settlement agreement with the partner *with respect to such items*[.]" (emphasis added))). In this case, the April 28, 1997 Settlement Agreements that Plaintiffs accepted did not address the sham-transactions at issue, nor was this issue specifically reserved therein for further adjudication. *Id.* (citing *Keener*, 76 Fed. Cl. at 463-464 ("[W]hile [the plaintiffs] contend that the [settlement] agreements were sufficient to convert the limitations issue into a nonpartnership item [pursuant to 26 U.S.C. § 6231(b)(1)(C)], they assert that the agreements did not resolve the limitations issue, leaving them free to litigate that issue here. If plaintiffs are right, their agreements put them in a truly enviable position-what might be described as 'heads we win, tails we win bigger[.]'")). Accordingly, Plaintiffs agreed to forgo adjudication of the sham transaction issue.

### 2.     The Court's Resolution.

Plaintiffs' refund claims cover their *total* partnership losses in 1993 and 1995, during which the partnerships were dissolved and terminated. *See* Compl. ¶¶ 9(D), 17(D). Therefore, the resulting losses were dependant upon the resolution of each of the partnerships' tax claims. Plaintiffs assert that the April 28, 1997 Settlement Agreements increased the basis of Plaintiffs' partnership interest by the amount of the loss the Settlement Agreements disallowed. *Id.*; *see also* Gov't Ex. 6, App. B at B-66, Gov't Ex. 14, App. B at B-136 (April 28, 1997 Settlement Agreements with CDV and VAR) (disallowing "approximately $3.4 million, or approximately 45%, of the farming and miscellaneous deductions [that] CDV originally reported" and "approximately $5.6 million, or approximately 50%, of the farming and miscellaneous deductions [that] VAR originally reported."). Accordingly, the refund

claims alleged in the December 6, 2004 Complaint are the same losses disallowed by the April 28, 1997 Settlements. *See* Compl. ¶¶ 9(D), 17(D) (loss disallowed by April 28, 1997 Settlements affecting over 99% of April 23, 1999 CDV refund claim and 100% of March 29, 1999 VAR refund claim).

It is well established that a federal taxpayer claiming a loss deduction must demonstrate the legitimacy of the transaction at issue, necessarily requiring an inquiry into the managing partners' conduct concerning those transactions. *See Brown*, 396 F.2d at 460-61 (considering nature of underlying transaction before denying claimed loss); *see also Transpac Drilling Venture, 1983-2 by Dobbins* v. *United States*, 32 Fed.Cl. 810, 820 (1995), *aff'd*, 83 F.3d 1410 (Fed. Cir. 1996) ("In regards to a transaction executed by a partnership, the business motives and the reasonable possibility of profit are determined at the partnership level."). Section 6221 of the I.R.C., however, provides that the issue of whether partnership transactions are legitimate is a "partnership item," and "the tax treatment of any partnership item . . . shall be determined at the partnership level." 26 U.S.C. § 6221.[11]

In March and April of 1999, Plaintiffs filed claims with the IRS for tax refunds for their partnership interests in the now dissolved CDV and VAR. *See* Compl. ¶¶ 8, 15. On December 6, 2002, however, the IRS rejected the VAR claim, but informed Plaintiffs that "AMCOR claims" would be treated as capital losses and included instructions for claiming these losses. *Id*. ¶ 16; *see also* Pls. Ex. 3. Therefore, the Complaint alleged sufficient facts regarding Plaintiffs' "injury in fact." *See Lujan*, 504 U.S. at 560. Nevertheless, the losses identified in Plaintiffs' March 29, 1999 and April 23, 1999 tax refund claims concern "partnership items," that Plaintiffs have no standing to pursue. *See* 26 U.S.C. § 7422(h) ("No [individual taxpayer] action may be brought for refund attributable to partnership items."); *see also Keener*, 76 Fed. Cl. at 468-470 ("[C]ourts directly dealing with the sham transaction doctrine have concluded that its application presents a partnership item.").

Plaintiffs are correct that 26 U.S.C. § 6230(c)(1)(B) provides an exception to Section 7422(h) of the I.R.C. *See* 26 U.S.C. § 6230(c)(1)(B) ("A partner may file a claim for refund on the grounds that . . . the Secretary failed to allow a credit or to make a refund to the partner in the amount of the overpayment attributable to the application to the partner of a settlement[.]"). But the Government also is correct that a court adjudicating a partner-level suit does not have jurisdiction to adjudicate partnership items. *See* 26 U.S.C. § 6230(c)(4) ("*No review of substantive issues*--For purposes of any claim or suit under this subsection, the treatment of partnership items on the partnership return, under the settlement, under the final partnership administrative adjustment, or under the decision of the court (whichever is appropriate) shall be conclusive." (emphasis added)). In other words, the Section 6230(c)(1)(B) exception applies only after a competent authority settles the underlying partnership item, *i.e.*, determining that the partnerships' transactions were entered into for profit and were not shams. In this case, the final partnership records for CDV and VAR do not address this issue, nor do the April 28,

---

[11] Section 6221 of the I.R.C. provides: "Except as otherwise provided in this subchapter, the tax treatment of any partnership item . . . shall be determined at the partnership level." 26 U.S.C. § 6221; *see also* Treas. Reg. § 301.6231 (defining a "partnership item" to involve "legal and factual determinations that underline the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction[.]").

11

1997 Settlements specifically resolve this issue for adjudication. *See* Gov't Ex. 6, App. B at B-65; Gov't Ex. 14, App. B at B-135 (April 28, 1997 Settlement Agreements with CDV and VAR leaving FPAA's findings that the partnerships' activities were sham transactions undisturbed and providing that "the treatment of partnership items under [the] agreement [would] not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact," and that "no claim for refund or credit based on any change in the treatment of partnership items may be filed or prosecuted"). Under these circumstances, the court does not have jurisdiction to determine whether the IRS failed "to make a refund to [the Plaintiffs] in the amount of the overpayment attributable to the application to the partner of a settlement[.]" 26 U.S.C. § 6230(c)(1)(B); *see also* Compl. ¶¶ 9(E), 17(E).

Although Section 6231(b)(1)(C) converts partnership items into non-partnership items upon a settlement agreement, this provision applies only where partnership items *specifically* were settled by agreement. *See* 26 U.S.C. § 6231(b)(1)(C) ("[T]he partnership items of a partner for a partnership taxable year shall become nonpartnership items as of the date the Secretary or the Attorney General (or his delegate) enters into a settlement agreement with the partner *with respect to such items*[.]" (emphasis added)). As previously discussed, the April 28, 1997 Settlement Agreements did not address the sham-transaction issue. *See* Gov't Ex. 6, App. B at B-65; Gov't Ex. 14, App. B at B-135 (April 28, 1997 Settlement Agreements with CDV and VAR). Accordingly, those "partnership items" *ipso facto* were not converted upon settlement to "non-partnership" items. *See* 26 U.S.C. § 6231(b)(1)(C); *see also Keener*, 76 Fed. Cl. at 463-464 ("Assuming, arguendo, that the [settlement] agreements did not settle the [partnership item] *sub judice*, then it would seem to follow that they were ineffective to convert that issue into a nonpartnership item for purposes of [26 U.S.C. §] 7422(h).").[12]

Whether a partnership transaction is a "sham" is a "partnership item." *See* 26 U.S.C. § 6231(a)(3); *see also* Treas. Reg. § 301.6231 (defining a "partnership item" to involve "legal and factual determinations that underline the determination of the amount, timing, and characterization of items of

---

[12] In reply, Plaintiffs further argue that the refund claims "represent [Plaintiffs'] outside basis in the investment in the partnerships as of the time the partnerships were terminated," and not the loss disallowed by the April 28, 1997 Settlement Agreements. *See* Pls. Resp. at 13. This *post-hoc* argument, however, is belied by the December 6, 2004 Complaint, wherein Plaintiffs seek a refund on partnership interests "as a direct consequence of the [S]ettlement[s]." Compl. ¶¶ 9(D), 17(D) (calculating CDV and VAR refund claims by the amount of loss disallowed by the April 28, 1997 Settlements). *See* Gov't Ex. 21, App. B at B-171, B-186. Even if Plaintiffs' newest argument was adopted, their refund claims still would be barred, because those claims concern a different factual basis than the March 29, 1999 and April 23, 1999 claims filed with the IRS, conflicting with the "substantial variance doctrine." *See* 26 U.S.C. § 7422(a) (no tax refund suit is permitted prior to filing a claim for refund with the Secretary); *see also* Treas. Reg. § 301.6402-2(b)(1) (a taxpayer claim "must set forth in detail each ground upon which a credit or a refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof."); *Ottawa Silica Co.* v. *United States*, 699 F.2d 1124, 1138 (Fed. Cir. 1983) (The preceding statute and regulation "preclude a taxpayer-plaintiff from substantially varying at trial the factual bases of its arguments from those raised in the refund claims it presented to the IRS.").

income, credit, gain, loss, deduction[.]"). Therefore, because resolution of Plaintiffs' refund claims necessarily involves resolution of "partnership items," Plaintiffs do not have standing to seek adjudication of the claims in the December 6, 2004 Complaint. *See* 26 U.S.C. § 7422(h).

## IV.   CONCLUSION.

For the aforementioned reasons, the Government's December 20, 2007 Motion To Dismiss is granted. The December 6, 2004 Complaint is dismissed, with prejudice.

The Clerk of the United States Court of Federal Claims is directed to enter judgment in accordance with this Memorandum Opinion And Final Order.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**
